Argued and submitted December 28, 2006, reversed and remanded
August 22, respondent's petition for reconsideration filed October 3
allowed by opinion December 26, 2007

Carley FRAKER
and Carol Fraker,
individually and as guardian ad litem for
Kelsey Fraker, a minor,
*Plaintiffs-Appellants,*

*v.*

BENTON COUNTY SHERIFF'S OFFICE,
Benton County Community Corrections,
and Lincoln County Sheriff's Office,
*Defendants,*

*and*

Debbie Marie COTTENGIM,
*Defendant-Respondent.*

Benton County Circuit Court
0010060; A125743

166 P3d 1137

Paul B. Meadowbrook argued the cause and filed the brief for appellants.

Rod M. Jones argued the cause and filed the brief for respondent.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Edmonds, Judge.*

BREWER, C. J.

---

* Brewer, C. J., *vice* Richardson, S. J.; Edmonds, J., *vice* Linder, P. J.

## BREWER, C. J.

In this negligence action, plaintiffs, a mother and her two daughters, appeal from a limited judgment granting summary judgment in favor of defendant.[1] The trial court concluded, as a matter of law, that plaintiffs had not presented evidence that would allow a jury to determine that defendant was liable for the harm that befell plaintiffs under either a special relationship or a general foreseeability theory. On appeal, plaintiffs assert that the trial court failed to consider the evidence, and all reasonable inferences that may be drawn from that evidence, in the light most favorable to them. Plaintiffs further argue that, when properly viewed, their evidence would have allowed a jury to find defendant liable to them under either a special relationship or a general foreseeability theory. We agree that plaintiffs presented evidence that would have allowed a jury to find in their favor on a general forseeability theory and, accordingly, reverse and remand.

We review the trial court's grant of summary judgment to determine whether defendant, the moving party, was entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). In reviewing the court's summary judgment ruling, we view the facts in the light most favorable to plaintiffs, the nonmoving parties. *McCabe v. State of Oregon*, 314 Or 605, 608, 841 P2d 635 (1992). This case involves an incident that occurred on December 22, 1998, during which Ken Fraker, husband and stepfather to plaintiffs, held plaintiffs hostage in their home in Toledo for several hours before eventually freeing them and killing himself. Fraker's stepdaughters had previously reported to Lincoln County authorities that Fraker had sexually abused them. The ensuing investigation resulted in a criminal indictment against Fraker on numerous counts of sexual abuse and unlawful sexual penetration, as well as one count of possession of child pornography. Fraker was living outside Oregon when the indictment was

---

[1] Plaintiffs have also named Benton County Sheriff's Office, Benton County Community Corrections, and Lincoln County Sheriff's Office as defendants in this case. Those defendants are not parties to this appeal. References to "defendant" in this opinion are to defendant Cottengim.

returned. After learning of the indictment, Fraker made plans to return to Oregon and surrender to authorities in Lincoln County.

On October 27, 1998, defendant, Fraker's friend and former coworker, picked Fraker up at the airport in Portland. She allowed Fraker to drive her car to Newport. During the drive, Fraker informed defendant that he had a gun and that he wanted to be dropped off on the highway between Toledo and Newport because he was going to kill plaintiffs and himself.[2] Fraker, in fact, pulled the car over on Highway 20 between Toledo and Newport and told defendant that he was leaving. Defendant convinced Fraker not to kill himself and to give her the gun. Fraker relinquished the gun to defendant and, while Fraker watched, she put the gun in the trunk of her car. They got back in the car and proceeded to Newport. Eventually, Fraker surrendered to authorities and was arrested and taken into custody. Defendant did not inform authorities about the incident on the way to Newport.

On November 4, 1998, the Lincoln County Circuit Court held a release hearing, at which defendant was present. The state began its argument against Fraker's pretrial release by noting that the case consisted of 26 counts of sexual abuse involving Fraker's stepdaughters. The state advised the court that Fraker's wife had asked not to be present at the hearing because she was so afraid of Fraker. After plaintiff and Fraker had separated and he had moved out of the family home, plaintiff had the locks changed. Fraker had then returned and broke windows and knocked holes in the doors, so that it would be difficult to install new locks. He told plaintiff that he could not be kept from coming back to the house any time he wanted. Plaintiff then obtained a restraining order against Fraker. Fraker then went to DMV and arranged to have one of his stepdaughters' driving privileges

---

[2] There is conflicting evidence in the summary judgment record about what Fraker said to defendant during this conversation. In her deposition, defendant testified that Fraker told her that he wanted to kill himself. However, in affidavits submitted in opposition to defendant's summary judgment motion, both of Fraker's stepdaughters stated that Fraker told them that he had told defendant that he wanted to kill them, their mother, and himself. As noted, we review the evidence in the light most favorable to plaintiffs, including the evidence about whether, when he pulled the car over on Highway 20 and disclosed that he had a gun, Fraker told defendant that he wanted to kill plaintiffs.

revoked. Plaintiff had told the assistant district attorney that Fraker was prone to "violent outbursts" and that, "if he's in a corner, * * * he's unpredictable and extremely dangerous." Plaintiff had also said that Fraker had told her that, if his life was going to end for some reason, he would return to a former workplace in Lewiston and "take people out." Lincoln County Senior Release Officer Marchel also testified that she had concerns about Fraker's ability to control his behavior if he were released.

After hearing the parties' arguments, the court released Fraker on home detention under the supervision of Benton County Community Corrections (BCCC).[3] Because Fraker had no local residence, defendant agreed to allow Fraker to reside in her apartment in Corvallis during his period of home detention. To document that agreement, defendant signed a roommate agreement with BCCC. The general terms of the agreement required defendant to remove all alcohol, drugs, and firearms from her home, to notify BCCC if Fraker left her residence at unauthorized times, and to allow her residence, vehicle, or property to be searched by a parole or probation officer. Any violation of the agreement could result in Fraker's removal from the home or from the home detention program.

During her deposition, defendant testified that she knew the following, based on conversations with Fraker before he returned to Oregon, on the drive to Newport from the airport, or while he was staying in her apartment on home detention: Fraker's stepdaughters were "responsible" for the indictment against him, which involved allegations of sexual abuse, and plaintiff was supporting her daughters and had initiated dissolution proceedings against him. Fraker was concerned about going to jail, particularly because he was afraid that sexual predators were subject to being raped in prison. Fraker had indicated that he would rather kill himself than go to prison.

On December 22, 1998, BCCC permitted Fraker to leave defendant's residence to travel to Newport to meet with

---

[3] Fraker had previously worked as a corrections technician at the Lincoln County Jail. For that reason, Lincoln County authorities transferred Fraker to the custody of BCCC while he awaited trial.

his attorney. After the meeting ended, instead of driving directly to Corvallis, as he had done on previous occasions after meeting with his attorney, Fraker detoured and drove to plaintiffs' home in Toledo. Fraker entered the home, found one of his stepdaughters, and tied her up with duct tape. He then doused the interior of the home with gasoline. Shortly thereafter, the second stepdaughter returned home with a friend. Fraker also bound them with duct tape. Later, Fraker's wife entered the home, also with a friend, and they, too, were taken hostage and restrained. Fraker drank heavily while in the home, brandished a gun repeatedly, and terrorized his five hostages with threats to kill them. After many hours, Fraker released plaintiffs and their friends. He then turned the gun on himself, shot himself in the head, and died instantly.

During the time that Fraker held plaintiffs and their friends hostage, police became aware of the situation. Benton County Deputy Sheriff Van Arsdall was dispatched to defendant's apartment. Defendant told Van Arsdall that, over the past few days, Fraker had told her that he would not go back to jail and had talked about fighting with police and killing his wife, his stepdaughters, and police.

Plaintiffs initiated this negligence action against defendants, including Cottengim, seeking compensation for the harm they suffered as a result of the events of December 22, 1998. As noted, defendant filed a motion for summary judgment. Defendant argued, first, that she had no special relationship with plaintiffs that would support negligence liability. Second, defendant contended that she could not be held liable under a general foreseeability theory because she had not "taken charge" of Fraker and because, in any event, Fraker's actions were not the reasonably foreseeable result of defendant's own actions. In response, plaintiffs advanced two specific theories of negligence. First, according to plaintiffs, a special relationship or status existed here because of the roommate agreement, which imposed on defendant a special responsibility to plaintiffs, and defendant breached that agreement by, among other things, allowing Fraker to have access to the gun in the trunk of her car. Further, plaintiffs asserted that defendant was liable for their harm under a general foreseeability theory because her actions created a

reasonably foreseeable risk of the kind of harm that befell plaintiffs. After a hearing during which the parties debated the merits of those arguments, the trial court granted summary judgment in favor of defendant. On appeal, plaintiffs reassert the legal arguments that they advanced to the trial court and contend that, based on the evidence before the trial court, summary judgment in defendants' favor was inappropriate.

■ Before we turn to the merits of the summary judgment motion and response, we must resolve a possible alternative ground for affirmance. As noted, the parties submitted memoranda and affidavits addressing whether a jury could find defendant liable to plaintiffs on either of two negligence theories, and the parties orally argued those issues to the trial court. The court took the matter under advisement. In a detailed letter opinion, the court addressed the merits of the parties' arguments and concluded that defendants were entitled to judgment as a matter of law. However, the trial court also made the following *sua sponte* observation:

> "Plaintiffs' Amended Complaint does not contain any specific allegations of negligence against [defendant]. [Plaintiffs] do allege that circumstances contrary to the Home Detention Roommate Agreement existed at unspecified times but there are no allegations that [defendant] was aware of or consented to these circumstances or that she was negligent in doing so. * * *

> "Under this state of the pleadings the motion for summary judgment should be granted."

On appeal, plaintiffs argue that, throughout the proceedings below, both the parties and the trial court operated under the understanding that plaintiffs were asserting a negligence claim against defendant under both special relationship and general foreseeability theories. ("The parties understood their conflicting positions on the merits * * * and argued them.") By the time that the trial court noticed and raised the facial defects in the complaint, defendant had already consented to try the claims against her, and so, according to plaintiffs, the complaint should be treated as if it were amended. Defendant responds that plaintiffs never sought to amend their complaint to include allegations of

negligence against her, and, accordingly, any claim of error is not preserved. Plaintiffs also rely on our decision in *Hussey v. Huntsinger*, 72 Or App 565, 696 P2d 580 (1985). Defendant responds that *Hussey* cannot be read as broadly as plaintiffs contend and that this issue is more properly controlled by our decision in *Finney v. Bransom*, 143 Or App 154, 924 P2d 319 (1996), *aff'd in part and rev'd in part*, 326 Or 472, 953 P2d 377 (1998). For the reasons set out below, we determine that plaintiffs' and defendant's arguments based on *Hussey* and *Finney* are inapposite. Instead, we conclude that plaintiffs correctly assert that defendant impliedly consented to trial of plaintiffs' negligence claim against her. Accordingly, under ORCP 23 B, we treat that claim as if it had been raised in the pleadings.

The resolution of this issue requires an examination of ORCP 23 A and B. ORCP 23 A governs amendment of pleadings generally and provides:

> "*A pleading may be amended by a party once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted, the party may so amend it at any time within 20 days after it is served. Otherwise, a party may amend the pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.* Whenever an amended pleading is filed, it shall be served upon all parties who are not in default, but as to the parties who are in default or against whom a default previously has been entered, judgment may be rendered in accordance with the prayer of the original pleading served upon them; and neither the amended pleading nor the process thereon need be served upon such parties in default unless the amended pleading asks for additional relief against the parties in default."

(Emphasis added.) Under ORCP 23 A, a party may amend its pleading as a matter of right in limited circumstances; outside of those limited circumstances, consent of the court or of the adverse party is required.

ORCP 23 B governs particularly amendments and other treatment of pleadings in connection with new issues or evidence that arises when issues are tried. Like ORCP 23 A,

it makes provision both for consent by the adverse party and for consent by the trial court:

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice such party in maintaining an action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

(Emphasis added.)

The first two sentences of ORCP 23 B govern situations in which, although issues do not appear in the pleadings, the parties nonetheless try them by express or implied consent. In those situations, the pleadings may be amended to reflect the new issues, but even if the pleadings are not so amended, the result of the trial of the unpleaded issues is not affected. In other words, when parties consent to trial of unpleaded issues, the issues are tried, even if the pleadings are never expressly amended to include them. In those circumstances, the consent of the adverse party is determinative, and the trial court is not called upon to consent or exercise its discretion. By contrast, the second two sentences of ORCP 23 B govern situations in which one of the parties does not consent to trial of unpleaded issues and, in fact, objects. In those situations, the trial court is called upon to exercise its discretion to determine whether "presentation of the merits of the action will be subserved" by amendment and "admission of such evidence" will not "prejudice [the adverse] party in maintaining an action or defense upon the merits."

■ The Supreme Court has construed ORCP 23 B consistently with that understanding:

"Under [ORCP 23 B], a party may amend a pleading to conform to the evidence, thus raising an issue not raised by the pleading. A party may also amend to raise an issue 'tried by express or implied consent of the parties.' Moreover, ORCP 23 B provides that failure to amend 'does not affect the result of the trial.' Thus, *a pleading for all practical and legal purposes is automatically amended whenever an issue not raised by the pleading is tried by consent.*"

*Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 355, 788 P2d 428 (1990) (emphasis added; footnotes omitted). As the Supreme Court explained, when issues are tried by consent, even if a party does not expressly seek to amend the pleadings, the pleadings are "for all practical and legal purposes * * * automatically amended." *Id. See also Smith v. Wallowa County*, 145 Or App 341, 345, 929 P2d 1100 (1996) (rejecting the defendant's argument that the plaintiffs had " 'transformed their case into a common law nuisance case' without pleading that theory * * * inasmuch as defendant's counsel acknowledged to the trial court during opening statement and closing argument that plaintiffs were proceeding under a common-law nuisance theory"; citing ORCP 23 B in connection with conclusion that the unpleaded theory was tried by consent of the parties); *Bidiman v. Gehrts*, 133 Or App 145, 151, 890 P2d 436, *rev den*, 321 Or 512 (1995) ("The thrust of ORCP 23 B is to permit the parties to try an issue not pled without a formal amendment when there is no objection on the part of the nonpleading party."); *Navas v. City of Springfield*, 122 Or App 196, 201, 857 P2d 867 (1993) ("Generally, a trial court has no authority to render a decision on an issue not framed by the pleadings. * * * ORCP 23 B states a limited exception to this rule: if the parties expressly or impliedly consent, they may try issues not raised in the pleadings.").

Here, the first part of ORCP 23 B—governing trial of unpleaded issues by consent—is implicated. Although defendant did not expressly consent to the trial of a negligence claim against her, as explained below, she impliedly consented. Accordingly, even though the pleadings were not amended, the trial of the issues is not affected.

To determine if a party has impliedly consented to trying an issue not raised in the pleadings, this court, in

*Mund v. English*, 69 Or App 289, 292, 684 P2d 1248 (1984), stated that "[t]he test should be whether the defendant would be prejudiced by the implied amendment, *i.e.*, whether he had a fair opportunity to defend and whether he could offer any evidence if the case were to be retried on a different theory." (Brackets in original; internal quotation marks omitted.) *Mund* involved a family dispute over ownership of a well. The plaintiffs sought to amend their complaint, after trial but before entry of the judgment, to allege an issue of irrevocable license. The trial court denied the plaintiffs' motion. We reversed, concluding that the parties had impliedly consented to trial of the irrevocable license claim, pointing to the following factors: The plaintiffs' and the defendant's trial memoranda reflected that they were alerted to the elements of a claim of irrevocable license, the defendant had not asserted that he was in any way prejudiced by consideration of the theory, and the defendant had not claimed that additional evidence would be necessary to meet the issue. *Id.*

Similarly, here, the issue of defendant's negligence was impliedly tried by the parties. Defendant recognized the "claim" against her and, in response to that claim, brought a motion for summary judgment on the basis of that claim. Further, defendant was given a full and fair opportunity to litigate the specific allegations of negligence at the hearing on the summary judgment motion. In addition, defendant has not argued that she could have offered any additional evidence or that she would be prejudiced by the amendment. It follows that the parties impliedly consented to try a claim of negligence against defendant, and we deem plaintiffs' complaint to have been amended accordingly.

Defendant's argument that plaintiffs failed to preserve a claim of error misses the mark. Defendant confuses this situation, where the parties impliedly consent to try a nonpleaded issue, with a situation in which a plaintiff moves to amend the complaint to add nonpleaded material. Where a plaintiff argues that she moved to amend and that her motion was wrongly denied, to satisfy the preservation requirement, she must establish that she sufficiently raised the issue of a proposed amendment. Here, by contrast, the parties impliedly consented to the trial of a nonpleaded

claim; that the adverse party and the trial court were on notice of the claim satisfies the purposes of the preservation requirement.

As noted, plaintiffs also rely on our decision in *Hussey*, while defendant relies on our decision in *Finney*. In *Hussey*, the plaintiff brought a tort action against SAIF Corporation and an attorney who worked for SAIF. The plaintiff's complaint included an allegation that the defendants had received her tort claims notice on or before September 30, 1982. The plaintiff responded to the defendants' request for admission that she had never provided a timely tort claims notice by denying the request and attaching to her response a copy of a September 30 letter from the plaintiff's attorney to a SAIF employee referring to the plaintiff's claim. The defendants moved for summary judgment on the ground that the plaintiff had not provided a timely tort claims notice because the September 30 letter was not sent to a "person responsible for administering claims" as required by the tort claims act. *Hussey*, 72 Or App at 567 (internal quotation marks omitted). In response, the plaintiff submitted, *inter alia*, an affidavit indicating that, within 14 days after the September 30 letter, the plaintiff's attorney had made a telephone call to a SAIF lawyer that described the nature of the plaintiff's claim and the damages she sought. The trial court granted summary judgment in favor of the defendants. The trial court held that the plaintiff had "conclusive[ly]" admitted that the September 30 letter *was* her tort claims notice and that the letter was insufficient as a matter of law. *Id.* at 568.

On appeal, the defendants argued that, because the plaintiff's complaint alleged that she provided tort claims notice on or before September 30, the plaintiff was prevented from introducing evidence of the later telephone call into the summary judgment record. *Id.* We analyzed the issue as follows:

"The answer involves the interplay between ORCP 23 B, which provides that amendments to the pleadings to conform to the proof shall be readily allowed at trial, and ORCP 47, which governs summary judgments. The Oregon rules are essentially identical to FRCP 15(b) and FRCP 56,

respectively, and we therefore look to federal cases for guidance. *Garrison v. Cook*, 280 Or 205, 209, 570 P2d 646 (1977); *Hoy v. Jackson*, 26 Or App 895, 897, 554 P2d 561, *rev den,* [276 Or 735] (1976).

> "The general federal rule is that 'if facts appear in affidavits which would justify an amended complaint, there may be ground for treating the complaint as though it were already amended to conform.' The federal cases establish a rule which will produce decisions on the merits rather than setting procedural traps for the parties, and we adopt it. In this case plaintiff presented evidence of the telephone conversation which she claims occurred after September 30. That evidence would justify an amended complaint, and we treat the complaint as if it were amended. On remand, plaintiff is entitled to make the amendments conform to the evidence that she produced."

*Id.* at 569 (citations omitted). In addition, we held that the plaintiff's response to the defendants' request for admission did not prevent the plaintiff from relying on other evidence about her tort claims notice because the defendants had asked only about a written tort claims notice. *Id.* at 569-70.

In *Finney*, the plaintiffs asserted several tort claims against the defendants, a teacher and a school district, arising out of alleged sexual abuse of their daughter. 143 Or App at 156. The complaint included three claims (battery, intentional infliction of emotional distress, and negligence) against the teacher and one claim against the school district (negligence). The defendants moved for summary judgment on the ground that the plaintiff had not provided a timely tort claims act notice. *Id.* at 157. The plaintiffs did not respond to the summary judgment motion until the day of the hearing, at which point they also filed a motion to amend their complaint to include a new claim against the school district under 42 USC section 1983. *Id.* The trial court denied the plaintiffs' motion to amend the complaint and granted summary judgment in favor of the defendants.

On appeal, the plaintiffs argued that, under *Hussey*, the trial court was without discretion to deny their proposed amendment because they had included evidence to support the new section 1983 claim. *Id.* at 161-62. We examined

*Hussey*, as well as another similar case, *U. S. National Bank v. Miller*, 74 Or App 405, 703 P2d 246 (1985), and concluded that those cases were distinguishable. In *Hussey* and *U. S. National Bank*, the issue had been whether the trial court could consider evidence of facts that had not been pleaded but that tended to support existing claims; in *Finney*, by contrast, the plaintiffs sought to add a new claim that had not previously been pleaded. 143 Or App at 164. We concluded that the issues in the former cases were purely evidentiary—whether proffered evidence was admissible under the pleaded claims—and therefore the bounds of the discretion of the trial court to deny amendments under ORCP 23 B were not then before us. *Id.* Accordingly, we held that trial courts retain the discretion under ORCP 23 B as defined in that rule to allow or deny amendments and rejected the plaintiffs' argument that the trial court was required to allow the amendment as a matter of law. *Id.* at 165.[4]

*Hussey* and *Finney* are inapposite here. In neither of those cases did the party arguing in favor of amendment contend that the opposing party had tried the issue by consent. If plaintiffs in this case had argued solely that they had sought to amend their complaint to add claims against defendant and that the trial court had erred in denying the amendment,

---

[4] The Supreme Court took review in *Finney* and affirmed in part and reversed in part, expressly noting that its analysis did not require it to address *Hussey* and *U. S. National Bank*. The court concluded that, because the plaintiffs filed their opposition to the summary judgment motion and the proposed amended complaint on the day of the hearing, and because that hearing was unreported, "the trial court is deemed to have refused to consider plaintiffs' late-filed documents as part of the summary judgment record." *Finney*, 326 Or at 483. Accordingly, the plaintiffs could not be heard to argue that *any* evidence in the record supported their proposed section 1983 claim.

Alternatively, the court rejected any argument by the plaintiffs that the trial court was obligated to grant their motion to add a new claim because the motion to amend was filed in a summary judgment context and because, if allowed, the amendment would preclude summary judgment:

"That position—if it *is* plaintiffs' position—is clearly contrary to law. Under the applicable rule of civil procedure, ORCP 23, there is only one circumstance in which a party is entitled to amend his or her pleading as of *right*, and that is before a responsive pleading has been filed (or, if no response is required, within 20 days of the original pleading). Otherwise, a party who wishes to amend must have the consent of the opposing party (either implicit or explicit) or of the court. In all circumstances in which the consent of the court is required, the court retains discretion to deny the motion."

*Id.* (emphasis in original; footnotes omitted).

we would, as indicated in *Finney*, have had to determine whether the trial court abused its discretion as defined in that rule. However, in this case, plaintiffs argue that the parties tried the negligence claim against defendant by consent. As explained above, when parties try unpleaded claims by consent, the trial court is not called upon to exercise its discretion; as ORCP 23 B provides, unpleaded issues tried by consent *"shall* be treated in all respects as if they had been raised in the pleadings." (Emphasis added.)

We therefore treat plaintiffs' negligence claim against defendant as if it had been raised in the pleadings and consider whether summary judgment in favor of defendant on that claim was appropriate. As noted, on review of a grant of summary judgment, we determine whether defendant, the moving party, was entitled to judgment as a matter of law, ORCP 47 C; *Jones*, 325 Or at 420, and we view the record, as well as all reasonable inferences that can be drawn from the record, in the light most favorable to plaintiffs, the nonmoving parties. *McCabe*, 314 Or at 608.

Under *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), unless plaintiffs invoke a "status, a relationship, or a particular standard of conduct that creates, defines, or limits * * * defendant's duty," the issue of defendant's liability for plaintiffs' harm "properly depends on whether [her] conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff[s]." Therefore, we first consider whether a special status, relationship, or standard of care exists in this case. If not, we then determine whether defendant could be found liable under a general foreseeability theory. *See Buchler v. Oregon Corrections Div.*, 316 Or 499, 504, 853 P2d 798 (1993) (stating that "[i]t is only when there is no such special relationship, status, or conduct that *Fazzolari's* general foreseeability principle * * * comes into play").

Plaintiffs assert that "[a] special relationship exists when there exists because of contract or other circumstances a special responsibility to plaintiffs to exercise reasonable care." Although plaintiffs do not specify whether they rely on a contract theory or "other circumstances," they assert generally that a special status or relationship existed because of

the BCCC roommate agreement that defendant signed to allow Fraker to reside in her apartment during his home detention. In plaintiffs' view, the roommate agreement was "intended to guard against Fraker's leaving her apartment except at approved times or being in possession of firearms." Accordingly, as we understand plaintiffs' argument, by virtue of the agreement, defendant had a special responsibility to plaintiffs that included not only the duty to keep Fraker in her apartment and not provide him with access to firearms, but also the duty to report to the trial court and BCCC Fraker's threats about killing plaintiffs.

It does not appear that plaintiffs contest that Fraker remained in the constructive custody of BCCC during his home detention at defendant's apartment. Under Benton County Sheriff's Order FS93-52, submitted into the summary judgment record by plaintiffs, "[a]ll Home Detention clients originating from Benton County Courts * * * shall be considered inmates of the Benton County Corrections Facility and their 'cell' assignment is their residence." Accordingly, the agreement did not transfer custodial responsibility for Fraker to defendant.

Sheriff's Order FS93-52 generally appears to contemplate that persons are being placed in their own homes during a period of home detention. The roommate agreement signed by defendant similarly contemplates that a person is being released to his or her own home; it states that defendant understands that Fraker "has been placed in the Home Detention Program, and that [with limited exceptions] he/she cannot leave *his/her home*." (Emphasis added.) The roommate agreement indicates defendant's agreement with certain requirements, *e.g.*, to report to BCCC if Fraker violated his schedule for leaving the residence, to have no firearms in the residence, and to agree to searches of her residence, car, or property. However, the agreement closed with the warning that "failure to cooperate with the terms and conditions of The Home Detention Program may result in [Fraker's] removal from either the residence or the Home Detention Program itself," not with a warning of any potential sanctions against defendant. Finally, the agreement was signed only by defendant, not also by any representative of BCCC.

To the extent that plaintiffs argue that, under the roommate agreement, defendant had a responsibility to protect plaintiffs or act in plaintiffs' best interest, they are mistaken. The roommate agreement was not a bilateral contract. It simply set out the terms of the home detention program and indicated that defendant agreed to abide by those terms. Nor did it mention plaintiffs, or the protection of anyone.

Plaintiffs' reliance on *Lewis-Williamson v. Grange Mutual Ins. Co.*, 179 Or App 491, 39 P3d 947 (2002), is misplaced. In *Lewis-Williamson,* we determined whether an insurance agent had a special duty to a homeowner-insured. *Id.* at 494. We noted that such a special duty could arise out of an agent-principal relationship or a situation in which one party has hired another in a professional capacity, and the professional is acting to further the client's economic interests. Finally, "certain contractual relationships can give rise to a duty to exercise reasonable care independently of the terms of the contract, depending on whether the terms of the contract create the type of relationship that gives rise to such a duty." *Id.* at 495. We understand plaintiffs to contend that defendant undertook a contractual obligation that created a special duty. However, as noted, the roommate agreement was not a contract. Nor, more broadly, did the roommate agreement create any relationship at all between defendants and plaintiffs, let alone one that imposed on defendant a special duty to guard against harm to plaintiffs.

Plaintiffs also rely on *Park v. Hoffard*, 315 Or 624, 632, 847 P2d 852 (1993), a case in which the Supreme Court held that a jury could find that a landlord had consented to or knew of the danger posed by a tenant's dog and that the dog would unavoidably involve an unreasonable risk of harm to persons off the rental property. The gravamen of liability in that case was the landlord-tenant relationship, which, by adopting *Restatement (Second) of Torts* § 379A (1965), the court recognized as a special relationship creating a duty. The court held that, in some circumstances, "the landlord can be liable for physical harm to persons off the rental property *caused by activities of the lessee * * * on the rental property.*" *Park*, 315 Or at 631 (emphasis added). Again, plaintiffs' argument is not well developed, but to the extent that they intend to argue that defendant and Fraker had a landlord-tenant

relationship, the record does not show that such a relationship existed. Moreover, *Park* contemplated landlord liability only for harm resulting from tenant activities on the property. Plaintiffs do not allege that the injuries in this case resulted from Fraker's activities at defendant's apartment.

 Because plaintiffs have demonstrated no special relationship, status, or standard of care that creates a duty in this case, we turn to the question whether a jury could find defendant liable under a general foreseeability theory. Whether an injury was foreseeable usually presents an issue of fact and, therefore, typically is not a likely candidate for summary judgment. *Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 337, 970 P2d 669 (1998), *rev den*, 328 Or 365 (1999). For liability to attach under a general foreseeability theory, a trier of fact must be able to find that there was a reasonably foreseeable risk of harm to the plaintiff and that the defendant's conduct was unreasonable in light of that risk. *Buchler*, 316 Or at 511-14; *Bertram v. Malheur County*, 204 Or App 129, 136, 129 P3d 222, *vac'd*, 341 Or 392, 143 P3d 544 (2006).[5] Intentional intervening criminal acts of a third person do not necessarily make the harm suffered by the plaintiff unforeseeable to the defendant. *Id.* at 139 (citing cases). Where, as here, plaintiffs' harm was caused by the criminal acts of a third party, defendant may be found liable if it was reasonably foreseeable to defendant that plaintiffs would suffer harm as a result of those criminal acts and if defendant unreasonably created the risk of the harm that befell plaintiffs or, stated differently, provided more than "mere facilitation" of the third party's criminal acts. *Buchler*, 316 Or at 511-12; *Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 393, 71 P3d 553 (2003).

We agree with plaintiffs that if, as they allege, defendant (1) knew about Fraker's history of breaking into plaintiffs' house and knew that Fraker was alarmed about the prospect of going to prison as a result of the sexual abuse allegations raised by his stepdaughters; (2) knew that Fraker had threatened plaintiffs' lives and his own life several times, and defendant failed to disclose those threats to authorities;

---

[5] The Supreme Court vacated our decision in *Bertram* after a petition for review had been filed in that court. To the extent we rely on the reasoning of that case here, we hereby readopt the reasoning we expressed in *Bertram*.

and (3) made her car available to Fraker after he had seen her place a gun in the car's trunk, a trier of fact could find that it was reasonably foreseeable that Fraker would go to plaintiffs' house and threaten or harm them and then take his own life. *See id.* at 392-94 (foreseeability of third party's actions can turn on the knowledge of the tortfeasor's propensity for violence and whether the plaintiff had been placed in a vulnerable situation; where the defendant had significant knowledge about the tortfeasor's mental health problems related to breakups of several relationships, including the breakup with the decedent, and where there had been previous verbal confrontations with the decedent, a jury could have found that the defendant had significant knowledge from which it could reasonably have inferred that the tortfeasor posed a danger to the decedent); *Cunningham*, 157 Or App at 338-39 (dispositive question was whether it was foreseeable that the plaintiff would come to harm as a result of criminal acts by others; where the defendant tavern forced the highly intoxicated plaintiff to leave its premises without calling for a ride home and the plaintiff was picked up by three men who raped and sodomized her, it was foreseeable that the defendant was placing the plaintiff "in harm's way"); *see also Washa v. DOC*, 159 Or App 207, 225, 979 P2d 273 (1999), *aff'd*, 335 Or 403, 69 P3d 1232 (2003) (general foreseeability analysis in a negligent supervision claim turns on whether, in light of the third party's criminal history, the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff).

In reaching the conclusion that plaintiffs' evidence, if believed, shows that defendant reasonably should have known that her conduct would create a risk of harm of the type that befell plaintiffs, we conclude that defendant was more than a mere " 'unwitting' " facilitator of Fraker's conduct. *Bertram*, 204 Or App at 140 (quoting *Buchler*, 316 Or at 512). In that regard, this situation is distinguishable from those in which the Supreme Court has affirmed grants of summary judgment involving intervening third-party conduct.

First, in *Buchler*, a prisoner took advantage of the keys left in a work crew van and escaped and, two days later, shot two people and killed one of them. In that case, the

Supreme Court emphasized that the van was not the "mechanism by which the escaped prisoner inflicted the harm." 316 Or at 512. Here, by contrast, if plaintiffs prove that the gun that defendant took from Fraker was the one that he used to terrorize plaintiffs and then kill himself, defendant did provide the mechanism by which Fraker inflicted the harm. In addition, although the court in *Buchler* noted that the fact that escaped prisoners may engage in criminal activity does not make a particular criminal act reasonably foreseeable, *id.* at 511, here, given Fraker's history with his wife and stepdaughters and the threats that he had made, the particular kinds of acts and the particular victims were precisely those that one might have expected.[6] In that regard, defendant was not a mere facilitator; the intervening harm-producing force, Fraker's criminal conduct, was a risk that was directly related to defendant's failure to report Fraker's threats and her giving him access to a gun.

Second, in *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 345, 83 P3d 322 (2004), the Supreme Court held that a decline in the market value of the plaintiff's stock was not a reasonably foreseeable result of the defendant accounting firm's negligent advice that caused a delay in offering the stock for sale because the intervening harm-producing force—the market decline—was not a risk created by the defendant's actions. In this case, however, the intervening harm-producing force—Fraker's criminal conduct—was a foreseeable risk directly related to defendant's alleged failure to report Fraker's threats and her making a gun available to him.

In short, defendant's actions, if proved, created a risk that plaintiffs would be subject to precisely the same type of injuries that befell them. A trier of fact could find that, if defendant was negligent in one or more of the ways that plaintiffs asserted, it was reasonably foreseeable that Fraker would harm plaintiffs and himself.

---

[6] We recognize that "the concept of foreseeability refers to generalized risks of the type of incidents rather than the predictability of the actual sequence of events." *McAlpine v. Multnomah County*, 166 Or App 472, 483, 999 P2d 522 (2000), *rev den*, 336 Or 60 (2003). In this case, something close to the actual sequence of events itself was reasonably foreseeable. We do not imply that, in other cases, a more generalized risk of types of incidents will not suffice.

The question remains whether a trier of fact could find that defendant's conduct was unreasonable in light of that risk. As discussed, the record could support the following findings: Defendant knew that Fraker previously had broken into plaintiffs' house and had broken the locks in such a way that made it difficult to install new ones; he then told his wife that he could not be kept from coming back if he wanted to. Defendant knew that Fraker had been charged with 26 counts of sexual abuse against his stepdaughters and that Fraker was afraid of what might happen to him in prison. She knew that he had stated that, if his life were to end for some reason, he would "take people out." She had heard Fraker directly threaten, more than once and as recently as several days before Fraker acted on those threats, to kill plaintiffs and take his own life. Despite that knowledge, defendant did not inform authorities of Fraker's threats, and she made a car and gun available to him. A trier of fact could find that defendant's conduct was unreasonable in light of the reasonably foreseeable risk that Fraker would inflict grievous injury on plaintiffs and himself. Accordingly, the trial court erred in granting summary judgment to defendant.

In conclusion, viewing the facts in the light most favorable to plaintiffs, a trier of fact could find that, if defendant was negligent in one or more ways supported by the evidence, it was reasonably foreseeable that Fraker would harm plaintiffs and that defendant's conduct was unreasonable in light of that risk. Thus, the trial court erred in granting summary judgment in favor of defendant.

Reversed and remanded.